# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| KEVIN FORBES, on Behalf of Himself and All Others Similarly Situated, | Civil Case No.  1:18-cv-5708 |
| Plaintiff, | ANTITRUST CLASS ACTION COMPLAINT |
| vs. | <u>JURY TRIAL DEMANDED</u> |
| GRAY TELEVISION, INC.; HEARST COMMUNICATIONS; NEXSTAR MEDIA GROUP, INC.; TEGNA INC.; TRIBUNE MEDIA COMPANY; and SINCLAIR BROADCAST GROUP, INC., | |
| Defendants. | |

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................. 2

PARTIES ................................................................................................................................ 3

AGENTS AND CO-CONSPIRATORS ................................................................................. 4

ADDITIONAL FACTUAL ALLEGATIONS ....................................................................... 5

I.    LOCAL TELEVISION INDUSTRY AND ADVERTISING ....................................... 5

   A.    Mechanics of Local Television Advertising ................................................... 5

   B.    The Shift Away from Local Television Advertising to Online Platforms ...................... 9

II.   DEFENDANTS CONSPIRE TO INCREASE LOCAL TELEVISION ADVERTISING
     PRICES CHARGED TO THEIR CUSTOMERS ........................................................ 12

   A.    Local Television Advertising Markets Are Conducive to Collusion ........................... 13

     1.    Local Television Advertising Markets Are Concentrated ......................... 13

     2.    High Barriers to Entry ................................................................. 14

     3.    Declining Demand ...................................................................... 16

   B.    The DOJ Investigates Price-Fixing in Local Television Advertising Markets ............. 16

   C.    Additional Plus Factors Support the Existence of a Conspiracy ................................ 17

     1.    Common Motive to Conspire ....................................................... 17

     2.    Actions Against Apparent Economic Self-Interest ......................... 17

     3.    Interfirm Communications and Other Opportunities to Collude ............... 19

ANTITRUST INJURY ........................................................................................................ 23

FRAUDULENT CONCEALMENT .................................................................................... 23

CLASS ACTION ALLEGATIONS ..................................................................................... 24

CLAIM FOR RELIEF ......................................................................................................... 26

REQUEST FOR RELIEF .................................................................................................... 27

JURY DEMAND .................................................................................................................. 28

Plaintiff Kevin Forbes, individually and on behalf of all others similarly situated ("the Class"), brings this class action complaint against Defendants Gray Television, Inc., Hearst Communications, Nexstar Media Group, Inc., Tegna Inc., Tribune Media Company, and Sinclair Broadcast Group, Inc., (collectively, "Defendants") for damages and injunctive relief pursuant to Section 1 of the Sherman Act, 15 U.S.C. §1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

## INTRODUCTION

1.     Defendants own and operate local television stations throughout the United States.  Their television stations are affiliated with various networks, *e.g.*, ABC, CBS, FOX, NBC, and CW.  As part of their business, Defendants sell air time for local television advertising.  Defendants are horizontal competitors in the sale of air time for local television advertising.

2.     Plaintiff is an advertising and marketing consultant who purchases air time from Defendants for local television advertising as part of his business.  Typical of the Class he seeks to represent, Plaintiff purchased local television advertising directly from one or more Defendants during the Class Period.

3.     Local television advertising remains a crucial source of revenue for Defendants. Defendants have, however, faced increased competition from companies offering online advertising platforms, such as Facebook and Google.

4.     On July 26, 2018, the *Wall Street Journal* reported that the United States Department of Justice's Antitrust Division ("DOJ") is investigating whether Defendants violated

the antitrust laws, resulting in higher local television advertising prices.[1]   DOJ's probe is reportedly focused on communications and the exchange of proprietary, competitively sensitive information between Defendants' ad sales teams.  DOJ discovered Defendants' conduct during its review of a proposed merger between Defendants Sinclair Broadcast Group Inc. and Tribune Media Company.[2]   A Sinclair spokesman told the *Wall Street Journal*, "It is our understanding that this [DOJ investigation] is not specific to Sinclair, but focuses on the larger broadcast industry."[3]

5.     Defendants' decision to collude on prices, instead of compete on rates of local television advertisements, was likely a response to combat the rapid shift in advertising dollars away from broadcast television commercials and toward various means of online and cable advertising from which they did not benefit.  Defendants' desire to band together to stave off their market decline is further evinced by the rapid consolidation in ownership of the "independent" local television stations that offer local TV advertising.

6.     As a result of their conduct, Defendants injured Plaintiff and Class members by artificially increasing prices for local television commercials.  Through this action, Plaintiff seeks relief.

## JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

---

[1]     Drew FitzGerald and Keach Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales*, WALL STREET JOURNAL (July 26, 2018), https://www.wsj.com/articles/ justice-department-investigates-tv-station- owners-over-advertising-sales-1532633979 (last accessed August 20, 2018).

[2]     *Id*.  The proposed merger has since been called off.

[3]     *Id*.

8. The Court has personal jurisdiction over Defendants subject to service under Section 12 of the Clayton Act, 15 U.S.C. §22. Defendants' collusive acts took place, in substantial part, in Illinois specifically and in the United States generally. These acts were conducted by persons and entities subject to the laws of the United States, including Illinois, as well as other states and territories.

9. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Antitrust Act, 15 U.S.C. §§15, 22, and 26, and 28 U.S.C. §1391(b), (c), and (d). One or more Defendant resides, transacts business, is found, or has agents in this District, a substantial part of the events giving rise to Plaintiff's claims arose in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

10. Defendants' acts were within the flow of, were intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States.

## PARTIES

11. Plaintiff Kevin Forbes is an advertising and marketing consultant located in Birmingham, Alabama. During the Class Period, Plaintiff directly purchased air time for local television advertising from Defendant Sinclair Broadcast Group's Tulsa, Oklahoma broadcast station, KTUL, and suffered injury by paying supracompetitive prices.

12. Defendant Gray Television, Inc. ("Gray") is a television broadcast company headquartered in Atlanta, Georgia. Through itself and its controlled subsidiaries, Gray owns and operates approximately 100 local television stations in the United States and sells air time for local television advertising.[4]

---

[4] On June 23, 2018, Gray entered into a merger agreement with Raycom Media, Inc. If the $3.6 billion merger is approved, and prior to any divestitures of stations, Gray will own and/or operate 142 full-power television stations, serving approximately 24% of United States television households.

13.     Defendant Hearst Communications ("Hearst") is a multimedia conglomerate headquartered in New York, New York. Through itself and its controlled subsidiaries, Hearst owns and operates approximately 32 local television stations in the United States and sells air time for local television advertising.

14.     Defendant Nexstar Media Group, Inc. ("Nexstar") is headquartered in Irving, Texas. Nexstar owns and operates approximately 170 television stations in the United States and sells air time for local television advertising.

15.     Defendant Tegna Inc. ("Tegna") is headquartered near McLean, Virginia. Through itself and its controlled subsidiaries, Tegna owns and operates approximately 47 local television stations in the United States and sells air time for local television advertising.

16.     Defendant Tribune Media Company ("Tribune") is headquartered in Chicago, Illinois. Through itself and its controlled subsidiaries, Tribune owns and operates approximately 43 television stations in the United States and sells air time for local television advertising.

17.     Defendant Sinclair Broadcast Group., Inc. ("Sinclair") is headquartered in Hunt Valley, Maryland. It operates as a national television broadcast company. Through itself and its controlled subsidiaries, Sinclair owns and operates 191 local television stations in the United States and sells air time for local television advertising.

## AGENTS AND CO-CONSPIRATORS

18.     Defendants' agents, including their officers, employees, or other representatives, ordered, authorized, or performed the acts alleged in this Complaint on Defendants' behalf in the normal course of their duties as Defendants' agents engaged to manage and operate Defendants' businesses or affairs.

19.     Each Defendant acted as the principal, agent, or partner for each other Defendant with respect to the acts, violations, and common course of collusive conduct alleged herein.

20.     Persons not named as Defendants may have committed acts in furtherance of the unlawful antitrust conspiracy alleged herein, such that they may be liable as a co-conspirators. Because the record of their conduct lies within their control or the control of the Defendants, Plaintiff is unable at this time to identify any such co-conspirators by name.

## ADDITIONAL FACTUAL ALLEGATIONS

**I.     LOCAL TELEVISION INDUSTRY AND ADVERTISING**

**A.     Mechanics of Local Television Advertising**

21.     According to Nielsen Media Research ("Nielsen") estimates, TV of all types (broadcast, cable, and satellite) reaches approximately 93% of the over 325 million people in the United States.[5]

22.     With such an extensive broad reach into the homes of so many Americans, television advertising remains an attractive means of marketing for global, national, and local entities.  In 2017, a total of over $70 billion was spent on television advertising in the United States.

23.     Typically, local television stations are affiliated with one of the five national parent networks:  ABC, CBS, FOX, NBC, and CW.  For example, WSBT in South Bend, Indiana is an affiliate of CBS and owned by Sinclair.  This means that WSBT is required to carry CBS's produced and purchased national content, like shows, national news programing, and national advertisements.  Each local affiliate also allocates time for local and regional programing and advertising.  Examples of this are local news and regional sports broadcasts.

---

[5]     Nielsen estimates that there are televisions in 119.6 million households, containing 304.5 million people over the age of two; http://www.nielsen.com/us/en/insights/news/2017/nielsen-estimates-119-6-million-us-tv-homes-2017-2018-tv-season.html (last accessed August 20, 2018).

24.     Local markets are demarcated by Nielsen into approximately 220 designated market areas ("DMAs").



25.     During both national and local programing, a portion of commercial advertising is designated for local advertisements.  Unlike advertisements for global brands, such as Coca Cola or Toyota, that are broadcast across all of a network's affiliate stations, local advertisements are typically for regional or local businesses.  Unlike national advertisement, the ads are only broadcast to the local station's viewership.

26.     As summarized by the Federal Communications Commission:

A distinction exists between the national and the local television advertising markets, based on the location of the consumers that the purchaser of the advertising time intends

to reach. Some companies (local advertisers) serve a geographically limited, or local, market and therefore wish to purchase advertising that reaches only local consumers. In contrast, other companies (national advertisers) compete in much larger geographic markets, and consequently seek to reach consumers nationwide.[6]

27. National advertisements are typically negotiated between the advertising entity, such as an advertising agency or company on the one hand, and the national network on the other.

28. When a local TV station pays a network like ABC for the right to broadcast a program like "*Jimmy Kimmel Live*," some of the advertising time is already sold by ABC. However, all network programing comes with local "avails" and these are retained and sold by the local affiliate. Most are very valuable and are often "bundled" to force the sale of less lucrative time. For example, the local CBS affiliate in Birmingham, Alabama demands a significant local total advertising buy to get avails during premium Southeastern Conference football broadcasts.

29. Unlike national advertisements, local advertisement rates are typically negotiated directly with the owners of the local television stations, including Defendants, or their agents.

30. Advertising rates are typically based on Gross Rating Points ("GRP"). GRP is calculated based on the percentage of the market an advertisement is predicted to reach multiplied by the number of times the advertisement runs a week. For example, an advertisement thought to reach 40% of a given market or platform and run five days a week would have GRP of 200.

---

[6] FCC, Notice of Proposed Rule Making, Review of the Commission's Regulations Governing Broadcast Television Advertising (1995), https://transition.fcc.gov/Bureaus/Mass_Media/Notices/fcc95226.html.

31.     For GRP calculation, an advertisement's reach is based on what the Nielsen ratings were during the same time the prior year.[7]  Therefore, GRP rates, even for the same program, can vary by local market and demographic makeup.

32.     GRP is the total amount of points that a buyer will purchase.  GRP is broken down to individual rating points.  These rating points are assigned a dollar value by the Defendants that in a competitive market would be based on the time of day or type of programing.

33.     The cost to buy a rating point is referred to as Cost Per Point ("CPP") and it varies by time of day and nature of programing.  The CPP during the day will be lower than the CPP in prime time. Prime time and sports typically have the highest CPP.  Daytime usually has the lowest CPP.  Unlike the publicly known, third-party Nielson ratings, CPPs are proprietary to each seller of advertising.

34.     Defendants then offer "rate cards" to prospective local advertising customers. Rate cards are based on GRPs for various programing.  Below is an excerpt of a rate card offered to Plaintiff by Defendant Sinclair-owned KTUL in Tulsa, Oklahoma for August 2014.

| Show: | Wk(s) of: 8-4 | Wk(s) of: 8-11 | Wk(s) of: 8-18 | Wk(s) of: 8-25 |
|---|---|---|---|---|
| Sa 6-6:30 pm, News 8 | $75 | $85 | $80 | $75 |
| ***Sold Out Wks: 9-1 | | | | |
| Su 5-5:30 pm, News 8 | $110 | $120 | $110 | $180 |
| M-F 6:30-7 pm, Wheel of Fortune | $750 | $800 | $700 | $700 |
| ***Sold Out Wks: 8-11, 8-18, 8-25 | | | | |
| M-F 10-10:35 pm, News 8 | $340 | $600 | $550 | $550 |
| ***Sold Out Wks: 8-18 | | | | |
| M-F/SU 10-10:35 PM, ROTATOR | $340 | $600 | $550 | $550 |
| Sa 10-10:35 pm, News 8 | $300 | $220 | $300 | - |
| Sa 10:30-11:05 pm, Late News After Football | - | - | - | $200 |
| Su 10-10:35 pm, News 8 | $300 | $340 | $320 | $300 |

---

[7]     There are approximately 119 million television households in the United States and Nielsen provides estimates for viewership based on a panel of 40,300 self-selecting households that remotely report their daily viewing patterns. Sahil Patel, *WTF is a GRP?* (Nov. 17, 2016). https://digiday.com/marketing/what-is-a-grp-gross-ratings-point/ (last accessed Aug. 20, 2018).

| | | | | |
|---|---|---|---|---|
| M-F 10:35-11:05 pm, Two and a Half Men | $280 | $300 | $220 | $300 |
| M-F 10:35-11:35 PM, ROTATOR | $280 | $300 | $220 | $300 |
| M-F 11:05-11:35 pm, Rules of Engagement | $130 | $180 | $140 | $130 |
| M-F 11:35p-12:35 am, Kimmel | $60 | $110 | $65 | $65 |
| ***Sold Out Wks: 8-11 | | | | |
| M-F 12:35-1:05 am, Nightline | $20 | $25 | $25 | $25 |
| Sa 10:35-11:05 pm, Two and a Half Men | $130 | $150 | $160 | - |
| ***Sold Out Wks: 8-4, 8-11, 8-18 | | | | |
| Sa 11:05-11:35 pm, Rules of Engagement | $75 | $85 | $80 | - |
| Sa 11:05-11:35 pm, Two and a Half Men After Football | - | - | - | $70 |
| Sa 11:35p-12:35 am, White Collar | $15 | $20 | $20 | - |
| Sa 11:35p-12:05 am, Rules of Engagement After Football | - | - | - | $50 |

35.     The customer then negotiates rates based on the figures provided in the rate card with the seller.  A savvy customer will shop around and solicit rates from the various entities in the hope of finding lower prices to aid them in negotiations.  Because rates vary by the popularity of the programing, overall prices for a given time of day in a DMA will not be uniform across various stations.  Further, because the historic Nielsen ratings used to calculate GRP are publicly known and the number of times an advertisement will run per week varies from project to project, the truly proprietary information in any station's or sales entity's pricing model is the CPP.  If Defendants collusively shared this information, they could formulaically fix the price for local TV advertisements across markets.

**B.     The Shift Away from Local Television Advertising to Online Platforms**

36.     Over the past decade, viewership has migrated from broadcast television to digital and online platforms. The chart below shows the closing gap between the average daily time spent watching television versus on the internet:[8]

---

[8]     Jeff Dunn, *TV is still media's biggest platform – but the internet is quickly gaining ground* (June 9, 2017), https://www.businessinsider.com/tv-vs-internet-media-consumption-average-chart-2017-6 (last accessed Aug. 20, 2018).



37.     This steady decrease in time spent watching television is, in part, attributable to shifting age demographics.  As the graph below shows, younger Americans spend less than half the amount of time watching television than elder Americans per week.



Further, the median age of Americans watching shows broadcast on local television stations skews middle aged and older.

---

9       Sapna Maheshwari and John Koblin, *Why Traditional TV Is in Trouble* (May 13, 2018), https://www.nytimes.com/2018/05/13/business/media/television-advertising.html (last accessed Aug. 20, 2018).



Both of these facts suggest that there is not likely to be a natural economic reversal of this trend or an ability to innovate a way out of it.

38. Not surprisingly, as the time Americans spend watching television declines, so too does the amount of dollars spent on television advertising. The following chart illustrates the decline.[11]

| US Total Media Ad Spending Share, by Media, 2014-2020 % of total | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| TV* | 39.1% | 37.7% | 36.8% | 35.8% | 34.8% | 33.7% | 32.9% |
| Digital | 28.3% | 32.6% | 35.8% | 38.4% | 40.8% | 43.1% | 44.9% |
| —Mobile | 10.9% | 17.3% | 22.7% | 26.2% | 28.8% | 31.0% | 32.9% |
| Print | 17.4% | 15.4% | 13.9% | 12.9% | 12.2% | 11.6% | 11.1% |
| —Newspapers** | 9.1% | 8.0% | 7.2% | 6.6% | 6.1% | 5.7% | 5.5% |
| —Magazines** | 8.3% | 7.4% | 6.8% | 6.4% | 6.1% | 5.8% | 5.6% |
| Radio*** | 8.4% | 7.8% | 7.4% | 7.0% | 6.7% | 6.4% | 6.1% |
| Out-of-home | 4.0% | 4.0% | 3.9% | 3.8% | 3.7% | 3.5% | 3.4% |
| Directories** | 2.8% | 2.5% | 2.2% | 2.0% | 1.9% | 1.7% | 1.6% |

Note: *excludes digital; **print only, excludes digital; ***excludes off-air radio & digital
Source: eMarketer, March 2016

205439                                                                      www.eMarketer.com

39. As the above chart indicates, in 2014, television advertising represented 39.1% of total media buys in the United States, with digital holding 28.3% of the market. By 2016, digital

---

[10] *Id.*

[11] *Digital Ad Spending to Surpass TV Next Year* (March 8, 2016), https://www.emarketer.com/Article/Digital-Ad-Spending-Surpass-TV-Next-Year/1013671 (last accessed Aug. 20, 2018).

advertising had surpassed television as the primary marketing platform in the United States, with $72.5 billion in advertising revenue versus $71.3 billion in television advertising.[12]

## II.   DEFENDANTS CONSPIRE TO INCREASE LOCAL TELEVISION ADVERTISING PRICES CHARGED TO THEIR CUSTOMERS

40.   Instead of competing for customers based on advertising rates as horizontal competitors would in an efficient market, Defendants reduced or eliminated competition through a common scheme to inflate, fix, or stabilize local television advertising rates.  The prices of local television commercials are based on the rates charged and quoted to customers by the stations operating in their respective local markets.  Defendants understood that they could halt the downward pressure on the prices of local television commercials by entering into agreements to fix rates and/or to not compete on rates across the numerous local television markets in which they operate.

41.   Absent an agreement to conspire regarding advertisement rates, Defendants could not unilaterally raise the prices above prevailing levels of profitably because they would lose customers to competitors with lower, competitive advertisements rates.

42.   Defendants' collusion, however, caused local television advertising to be sold at artificially high prices. Defendants' unlawful conduct deprives Plaintiff and Class members who purchase local television advertising the benefits of a competitive marketplace, causing artificially high prices.

43.   The harm Plaintiff and the Class members have suffered is quantifiable. Average advertising costs are collected by Nielsen-owned SQAD and can be reported by quarter, time of day, and by market.  The added costs that Plaintiff and the Class members incurred due to

---

[12]   George Slefo, *Desktop and Mobile Ad Revenue Surpasses TV for the First Time*, http://adage.com/article/digital/digital-ad-revenue-surpasses-tv-desktop-iab/308808/ (April 26, 2017).

Defendants' anticompetitive conduct result in artificially high prices charged to purchasers of local television advertising. Thus, as a direct, intended, foreseeable, and proximate result of Defendants' unlawful conspiracy, Plaintiff and the Class were injured in their business and property, in violation of federal antitrust laws.

**A.     Local Television Advertising Markets Are Conducive to Collusion**

44.     Local television markets have characteristics that make them susceptible to collusion. These include (1) high market concentration; (2) high barriers to entry; and (3) declining demand.

**1.     Local Television Advertising Markets Are Concentrated**

45.     Agreements are less costly to reach, all else equal, when there are few participants in a market. The more participants, the more difficult is the task of reaching consensus and coordinating behavior, all else equal.[13] As the DOJ states:

> Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are 'fringe' sellers who control only a small fraction of the market.[14]

46.     The consolidation of local television station ownership concentrated the majority of the price-setting power for local advertisement in the hands of six market participants. The fewer members of a pricing conspiracy, the easier it is to fix prices and police participation. In a 12-year span, the number of local stations owned or operated by Defendants grew from 179 in 2004 to 443 in 2016.

---

[13]     *See, e.g.*, Carlton, D. and Perloff, J., *Modern Industrial Organization*, Boston, MA: Pearson Addison Wesley, Chapter 5 (4th ed. 2005).

[14]     U.S. Department of Justice, "*Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For*" (June 25, 2015), http://www.justice.gov/atr/public/guidelines/ 211578.htm (last accessed Aug. 20, 2018).

13



47.     The five major television networks have a total of 1,097 full-power affiliate stations domestically.  Following the recently announced acquisition by Gray of Raycom Media, Inc., Defendants would control a majority of the market for viewers by reaching nearly 100% of United States homes with televisions.  Combined, Sinclair and Tribune control 235 stations in 108 of the 220 DMAs, reaching 72% of domestic viewers.[15]

### 2.     High Barriers to Entry

48.     Supra-competitive prices should attract new participants into a market.  The presence of barriers that delay or limit the entry of firms into a market tends to make that market relatively more conducive to the formation and maintenance of an agreement to collude.[16]  A high cost to enter the market provides a barrier to entry that inhibits participation by new (and

---

[15]     Alvin Chang, *Sinclair's takeover of local news, in one striking map* (April 6, 2081), https://www.vox.com/2018/4/6/17202824/sinclair-tribune-map (last accessed Aug. 20, 2018).

[16]     *See, e.g.*, Carlton, D. and Perloff, J., *Modern Industrial Organization*, Boston, MA: Pearson Addison Wesley, Chapter 5 (4th ed., 2005).

potentially disruptive) players in the market. Thus, high barriers to entry can facilitate collusion by protecting conspirators from competition.

49.     As discussed above, when a local TV station pays a network like ABC for the right to broadcast a program like "*Jimmy Kimmel Live*," some of the advertising time in the program is already sold by ABC. The local station, therefore, does not sell all the advertising time in the program – just the portion, sometimes contractually reserved, not previously sold by ABC.  This has an important implication regarding barriers to entry.   The existence of advertising minutes split with broadcast networks contractually limits the supply of local advertising minutes.  Suppose, for example, that local affiliates of two broadcast networks agree to raise prices in a given area.  A non-collusive local affiliate of a third broadcast network cannot increase its supply of advertising minutes as it only receives a given number of minutes every half hour (generally four minutes) due to the contract with its broadcast network.

50.     One need only look at the price tag of recent proposed mergers in the industry to understand that the costs of entry into this market are prohibitive to all but a very select few.[17] Any entity attempting to enter the local television market from scratch would have to invest significant capital in broadcasting equipment and infrastructure, employees and on-air talent, and programing made by third parties, among other necessary elements.  They would then have to attempt to build and retain an audience in a market that already likely has several long-standing established market participants in order to become a viable target for advertisers.

51.     All television broadcasters must also obtain a license from the government and abide by certain regulations.  The FCC issues such licenses and has the ability to restrict some

---

[17]     The above-mentioned proposed Gray/Raycom merger is priced at $3.6 billion and Sinclair's recently called-off acquisition of Tribune was set at $3.9 billion.

content.  Importantly, there has been no significant increase in the number of television licenses in the past 20 years.  Finally, the FCC and DOJ also weigh in on any proposed acquisitions or mergers in the broadcast market, creating a possible impediment to growth.

### 3.  Declining Demand

52.    As shown above, TV advertising is facing declining demand as more and more advertisers shift to online platforms.  At the same time, the number of TV stations has stayed relatively stable, meaning that amount of air time for local advertising has stayed the same.  In a normal functioning market, a decrease in demand would normally lead to a decrease in prices as competitors sought to sell their available local advertising air time at decreased costs.

53.    In a period of declining demand, firms have a greater incentive to collude with each other to raise prices.  In explaining the motive to conspire as a plus factor, an American Bar Association ("ABA") Section of Antitrust Law publication describes "a text book example of an industry susceptible to efforts to maintain supracompetitive prices"[18] as a market that "was concentrated in a few large sellers, demand . . . was declining, and suppliers had excess capacity and high fixed costs. . . ."[19]  This fairly describes the local television advertising markets.

### B.    The DOJ Investigates Price-Fixing in Local Television Advertising Markets

54.    On May 8, 2017, Sinclair announced that it had agreed to acquire Tribune for $3.9 billion.  The deal would have given Sinclair control of over 200 local television stations and extended its reach into 70% of United States homes.[20]

---

[18]    ABA Section of Antitrust Law (2010), *Proof of Conspiracy Under Federal Antitrust Laws* at 76 (quoting from *In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004)).

[19]    ABA Section of Antitrust Law (2010), *Proof of Conspiracy Under Federal Antitrust Laws* at 75.

[20]    Dawn C. Chmielewski, *Justice Department Investigating Local TV Station Owners Over Ad Sales – Report* (July 26, 2018), https://deadline.com/2018/07/justice-department-investigating-local-tv-station-owners-ad-sales-report-1202434431/ (last accessed Aug. 20, 2018).

55. According to a July 26, 2018 *Wall Street Journal* report, during the DOJ's review of the proposed merger, it discovered evidence that Sinclair, Tribune, and "other independent TV station owners coordinated efforts when their ad sales teams communicated with each other about their performance, potentially leading to higher rates for TV commercials[.]"[21]

## C. Additional Plus Factors Support the Existence of a Conspiracy

56. Additional circumstantial evidence, known as "plus factors," support the pleading of a plausible horizontal agreement by Defendants to increase the prices for local television advertisements. These plus factors include: (1) a common motive to conspire; (2) actions against their apparent economic self-interest; and (3) inter-firm communications or other opportunities to conspire.

### 1. Common Motive to Conspire

57. Defendants had a common motive to conspire. Each Defendant faced declining demand for air time for local television advertising. To fill their capacity, Defendants would have to cut prices. But by working together, Defendants could stabilize or even increase prices for local television advertising.

### 2. Actions Against Apparent Economic Self-Interest

58. Defendants took actions against their economic self-interest. According to the media reports about the DOJ investigation, Defendants' ad sales teams shared competitively sensitive information with each other. Absent an agreement, a competitor would not share such information with its competitor, because its competitors would use that information against it. With a collusive agreement in place, however, the sharing of competitively sensitive

---

[21]     Drew FitzGerald and Keach Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales*, WALL STREET JOURNAL (July 26, 2018) https://www.wsj.com/articles/justice-department-investigates-tv-station- owners-over-advertising-sales-1532633979 (last accessed August 20, 2018).

information, such as CPP and GRP, *i.e.*, a price grid, facilitates price-fixing. And this is what DOJ antitrust is investigating.

59.     The ease with which a participant in a price-fixing agreement can observe prices, capacities, market shares, and quantities produced and sold influences the ability to maintain the agreement. As noted by Kovacic, *et al.*: "Communication is a central part of the operation of a cartel."[22]   Kovacic, *et al.* conclude that communications among rivals constitutes a plus factor, as they discuss:

> Overall, information is a valuable commodity. For one seller to know information about a rival is to give that seller a competitive advantage. A competitor has no unilateral interest in disadvantaging itself relative to its rivals.

> Suppose one seller knows the customers who purchased from another seller in the past quarter and knows the price and quantity of each transaction with each customer during the past quarter. The receiver will argue that it wants to know these things in a competitive marketplace and that it cannot be expected to ignore such information when it comes to its attention. However, why would the sender convey such information? Sloppiness and incompetence in the management of critical business information are not legitimate reasons. The sender may argue that it did not convey the information, but rather that each buyer gave this information to the receiver. But how would a buyer gain by conveying information to a nonawardee about the terms offered by an awardee? In the absence of direct evidence that such conveyances were made, it is reasonable to assume that the sender transmitted the information to the receiver. But the sender would have no unilateral self-interest in doing so. Thus, the motivation must be explicit collusion, and there must be an expectation of reciprocation.

> With regard to firm-specific production information, again there is no reasonable explanation for such a conveyance by a noncollusive seller to another noncollusive seller. Unilateral knowledge of a rival's capacity utilization, inventory levels, or production costs will increase expected returns in any competitive bidding process. The conveyance of firm-specific production and sales information is important for monitoring compliance with many cartel agreements. For example, market share allocations require knowledge of exactly this kind of information, as well as the ability of cartel members to verify such

---

[22]     William E. Kovacic, Robert C. Marshall, Leslie M. Marx and Halbert L. White, *Plus Factors and Agreement in Antitrust Law*, MICHIGAN L. REV., Vol. 110, No. 3 at 423 (Dec. 2011).

information.  Sometimes cartels will use trade associations, export associations, or outside consultants to convey this information among themselves.[23]

Exchanging competitively-sensitive information would be against Defendants' apparent economic self-interest, and circumstantial evidence of an antitrust conspiracy.

### 3.  Interfirm Communications and Other Opportunities to Collude

60.  Defendants had ample opportunities to conspire at various industry organization and advocacy group meetings and through their use of the same sale representative companies.

### a.  Industry Organizations and Advocacy Groups

61.  Defendants had ample opportunity to trade proprietary advertising sales data at a variety of trade organizations.

62.  The Television Bureau of Advertising, Inc. ("TVB") is a "not-for-profit trade association representing America's $21 billion local broadcast television industry" whose "members include over 800 individual television stations, television broadcast groups, advertising sales reps, syndicators, international broadcasters, and associate members."[24]

63.  All six Defendants are members of the TVB.

64.  Among the benefits that come with TVB membership are access to the advertisement spending and revenue data of members via the TVB AE Dashboard, and TVB Road Shows.  The TVB Road Shows are described as "a customized market event for local advertisers not currently using broadcast TV . . . hosted by TVB member stations."[25]

65.  As part of TVB, on November 20, 2017, Defendants announced the creation of the TV Interface Practices or "TIP" Initiative.  TIP is "an industry work group dedicated to

---

[23]    *See*, *e.g.*, *id.*, at 423-24.

[24]    https://www.tvb.org/AboutTVB.aspx (last accessed Aug. 20, 2018).

[25]    https://www.tvb.org/Default.aspx?TabID=1519.

developing standard-based interfaces to accelerate electronic advertising transactions for local TV broadcasters and their media agency partners."[26]

66.     After TIP was made public, three of the Defendants' CEOs made statements evincing their desire to work collaboratively.  In the same press release, Perry Sook, Nexstar's President and CEO, stated that they all "must work together as an industry"; Sinclair's President and CEO, Chris Ripley, stated that "[t]he TIP Initiative demonstrates the industry's shared commitment to working together" to boost advertising sales; and Tribune's President and CEO, Larry Wert, suggested that the TIP Initiative would allow Defendants to "actively work[] together."[27]

67.     The National Association of Broadcasters ("NAB") describes itself as "the voice for the nation's radio and television broadcasters" and that "[a]s the premier trade association for broadcasters, NAB advances the interests of our members in federal government, industry and public affairs; [and] improves the quality and profitability of broadcasting[.]"[28]

68.     All six Defendants are members of the NAB.

69.     Tegna's President and CEO, David Lougee, and Hearst's President, Jordan Wertlieb, both serve on NAB's Executive Committee.[29]  Gray TV's Chairman, President, and CEO, Hilton Howell; Nexstar's Chairman, President and CEO, Perry Sook; Sinclair's President

---

[26]     *Local Television Broadcasters' TIP (TV Interface Practices) Initiative to Accelerate Electronic Workflow for TV Advertising Transactions* (Nov. 20, 2017), https://www.businesswire.com/news/home/20171120005141/en/Local-Television-Broadcasters%E2%80%99-TIP-TV-Interface-Practices (last accessed Aug. 20, 2018).

[27]     *Id.*

[28]     https://www.nab.org/about/default.asp (last accessed August 20, 2018).

[29]     https://www.nab.org/about/nabBoard.asp (last accessed August 20, 2018).

and CEO, Chris Ripley; and Tribune's COO, Kathy Clements, are members of NAB's Television Board of Directors.[30]

70. The mission statement of the Media Rating Council ("MRC") is to "[s]ecure for the media industry and related users audience measurement that is valid, reliable, and effective" by "[s]etting Standards and [c]onducting audits performed by an independent CPA firm to verify compliance with our Standards[.]"[31]

71. All six Defendants are members of the MRC.[32]

72. MRC facilitates communication between horizontal competitors by listing that one of the benefits of membership is that "[m]embers are exposed to other members' ideas and thoughts" and that "[m]embers can attend formal education seminars."[33]

73. Each of these trade organizations not only gave Defendants ample opportunities to meet with one another; their explicit purpose was, in part, to share information or to increase profitability.

**b. Defendants Engaged the Same Sales Representative Entities to Sell Local Television Advertising**

74. The Defendants regularly use outside sales agencies which keep rosters of local television stations and sell advertising nationwide while serving as a liaison between the stations and larger media buyers.

75. For example, if an advertising agency wanted to place one of its client's ads on broadcast television across the Midwest, it could just contact a sales representative company that

---

[30]     *Id.*

[31]     http://mediaratingcouncil.org/Mission%20Statement.htm (last accessed August 20, 2018).

[32]     http://mediaratingcouncil.org/Member%20Companies.htm (last accessed August 20, 2018).

[33]     http://mediaratingcouncil.org/Benefits.htm (last accessed August 20, 2018).

has a roster of stations across the region owned by different parent companies, instead of trying to negotiate rates with each individual station.

76.     The largest sales representative, which facilitated advertisement sales on behalf of several Defendants, Katz Media Group, boasts a roster of "more than 800+ stations across all major networks," has "an enormous geographic footprint that touches nearly every state across the country,"[34] and "transact[s] business daily utilizing the latest programmatic platforms and automated technologies to monetize results for our clients[.]"[35]

77.     Katz claims to be "one-stop shopping to build a local presence."[36]

78.     Another large sales representative, utilized by several Defendants, CoxReps, maintains a "roster of 400+ local television stations . . . covering more than 87% of all U.S. TV households."[37]  Its mission is "to maximize revenue for client stations and provide value to agency partners."[38]

79.     Both Katz and CoxReps conduct advertising sales negotiations for local advertising on a national level on behalf of the Defendants.  The ability to serve as both a means for sharing proprietary pricing and sales data and an instrument to carry out the implementation of supra-competitive prices is readily apparent.

80.     These sales representative companies amount to a centralized database of all the Defendants' proprietary local pricing and sales data.  They represent another element of the local

---

[34]     http://katztvgroup.com/ourdivisions/SitePages/localactivation.aspx (last accessed August 20, 2018).

[35]     http://katztvgroup.com/ourdivisions/SitePages/adsalesoperations.aspx (last accessed August 20, 2018).

[36]     http://katztvgroup.com/ourdivisions/SitePages/localactivation.aspx (last accessed August 20, 2018).

[37]     https://www.coxreps.com/ (last accessed August 20, 2018).

[38]     *Id*.

television advertising market that makes the possibility of anticompetitive collusion more plausible.

## ANTITRUST INJURY

81.    As a result of Defendants' conduct, Plaintiff and the Class have suffered antitrust injury.  Defendants are horizontal competitors who compete to sell air time for local television advertising.  Plaintiff and the Class are their customers who buy local advertising air time from them.  Defendants conspired to increase the price for local television advertising.  Plaintiff and the Class directly paid the supra-competitive price to Defendants.  Plaintiff and the Class have suffered the quintessential antitrust injury – purchasing a price-fixed product directly from horizontal competitors.

## FRAUDULENT CONCEALMENT

82.    No reasonable amount of diligence by Plaintiff or the Class would have uncovered Defendants' scheme.  Any statute of limitations is therefore tolled by Defendants' intentional concealment of their fixing of rates for local broadcast television advertising. Plaintiff and Class members were deceived regarding Defendants' collusion to fix and/or maintain artificially high prices for local television advertising and could not reasonably discover the Defendants' anticompetitive conduct.

83.    As alleged herein, Defendants' fixing of local broadcast television advertising rates was material to Plaintiff and Class members at all relevant times.  Plaintiff and Class members could not have discovered that Defendants were fixing rates for local broadcast television advertising because how each station or sales entity calculates local broadcast television advertising is not publicly disclosed.  This made it possible for Defendants to conspire together to conceal the fact that they were not acting as competitors in this market.

84.     Plaintiff and the Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were fixing the prices of local broadcast television advertising.  In fact, Defendants' conduct was only discovered because DOJ was able to review their internal documents as part of a merger review.  Plaintiff and the Class have no such access to Defendants' documents.

85.     Defendants knowingly, actively, and affirmatively concealed the facts alleged herein, including their fixing of the pricing of local broadcast television advertising.  Plaintiff and Class members reasonably relied on Defendants' public and private statements that they were offering competitive rates.

86.     All applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations.

## CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action under Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2), and (b)(3) on behalf of himself and all members of the proposed Class, as defined below:

> All persons who purchased local television advertising in the United States directly from Defendants, or any current or former subsidiary, affiliate, or agent of Defendants, or any co-conspirator, during the period from at least and including January 1, 2014 until the present (or until such time as the effects of Defendants' unlawful conduct ceases).  Excluded from the Class are Defendants; the officers, directors, agents, or employees; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on their behalf.  Also excluded from the Class are any judicial officers presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to the trial.

24

88. The Class is readily ascertainable and one for which records should exist, including, specifically, Defendants' sales records, Plaintiff's and the Class's records, and records from third-party vendors that monitor, analyze, and distribute Defendants' market data.

89. Plaintiff believes that there are thousands of geographically dispersed Class members throughout the United States. The exact number and their identities should be known by Defendants or capable of identification via third parties.

90. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and the Class sustained damages arising out of Defendants' alleged herein. The damages of each member of the Class were directly caused by Defendants' illegal conduct.

91. There are questions of law and fact common to the Class, including, but not limited to, the following:

    a. whether Defendants and their co-conspirators and agents engaged in a conspiracy with each other to share confidential information regarding local television advertising rates;

    b. whether Defendants' conspiracy impacted the price of local television advertising sold to the Class;

    c. the length of the conspiracy;

    d. whether Defendants intentionally concealed their scheme;

    e. whether Defendants' conduct is a *per se* violation of Section 1 of the Sherman Act;

    f. an appropriate class-wide measure of damages; and

    g. the appropriate injunctive relief.

92.     Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff's issues are the same as, and not antagonistic to, all members of the Class, and Plaintiff has retained competent counsel experienced in the prosecution of antitrust class actions.

93.     Questions of law or fact are common to all members of the Class and predominate over any individual issues of members of the Class.

94.     A class action is the superior means for the efficient adjudication of these allegations.  The prosecution of a multitude of separate actions by individual members of the Class would impose massive burdens on the courts and Defendants and would create a risk of inconsistent adjudications of the law and facts common to the Class.

95.     A class action will achieve substantial economies of time, effort, and expense and will assure uniformity of decision as to all similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

**CLAIM FOR RELIEF**

**Violations of §1 of the Sherman Act, 15 U.S.C. §1**
**(Against All Defendants)**

96.     Plaintiff repeats and incorporates by reference all of the foregoing allegations of this Complaint.

97.     From January 1, 2014, and continuing through the present, Defendants entered into and engaged in a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

98.     Plaintiff alleges a contract, combination, or conspiracy exists between or among Defendants that unreasonably restrains trade.  The conspiracy consisted of a continuing

agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, or made artificial prices related to local broadcast television advertisements as alleged herein.

99.     As horizontal competitors, Defendants' price-fixing conspiracy is a *per se* violation of the Sherman Act.  It is therefore facially an unreasonable and unlawful restraint of trade that had anticompetitive effects, as alleged herein.  In any event, there is no legitimate business justification for Defendants' restraint of trade. Any purported pro-competitive benefit was pre-textual or could have been achieved by less restrictive means.

100.    As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy and overt acts taken in furtherance thereof, Plaintiff has suffered injury to his business or property.  The injury to Plaintiff and members of the Class are of the type the antitrust laws were created to prevent and flow from Defendants' unlawful conduct.

101.    Defendants' conduct alleged herein substantially impacted the flow of interstate commerce because local broadcast television advertisements are purchased throughout the United States.

102.    Plaintiff requests the Court to enter judgment in his favor against Defendants, jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such relief as the Court deems just.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

B.     That the Court enter an order declaring that Defendants' actions, as alleged herein, violate the law;

C.     That the Court award Plaintiff and Class members damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

D.     That the Court permanently enjoin Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof from continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.     That the Court award Plaintiff pre- and post-judgment interest;

F.     That the Court award Plaintiff his costs of suit, including reasonable attorneys' fees and expenses; and

G.     That the Court award any and all such other relief as the Court may deem proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: August 21, 2018                    McCUNE WRIGHT AREVALO, LLP

                                          _s/ Derek Y. Brandt_____
                                          Derek Y. Brandt
                                          100 N. Main St., Suite 11
                                          Edwardsville, IL 62025
                                          Telephone: 618-307-6116
                                          dyb@mccunewright.com

Christopher M. Burke
Walter W. Noss
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
cburke@scott-scott.com
wnoss@scott-scott.com

Joseph P. Guglielmo
Thomas K. Boardman
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
tboardman@scott-scott.com

E. Kirk Wood
WOOD LAW FIRM, LLC
P. O. Box 382434
Birmingham, AL 35238-2434
Telephone: 205-908-4906
Facsimile: 866-747-3905
ekirkwood1@bellsouth.net

*Attorneys for Plaintiff Kevin Forbes*